# IN THE SUPREME COURT OF TENNESSEE
## SPECIAL WORKERS' COMPENSATION APPEALS PANEL
## AT JACKSON
August 20, 2001 Session

## ROBERT LEEGRAND v. TRINITY UNIVERSAL INSURANCE

**Direct Appeal from the Chancery Court for Madison County**
**No. 55719     Joe C. Morris, Chancellor**

---

**No. W2000-02664-SC-WCM-CV - Mailed March 20, 2002; Filed May 22, 2002**

---

This workers' compensation appeal has been referred to the Special Workers' Compensation Panel of the Supreme Court in accordance with Tennessee Code Annotated § 50-6-225(e)(1999) for a hearing and reporting to the Supreme Court of findings of fact and conclusions of law. The appellant presents the following issues for review: (1) Whether the trial court erred in ruling that the plaintiff did not sustain an injury that arose out of his employment; (2) whether the trial court erred in ruling that the plaintiff received no permanent disability from his injuries; (3) whether the trial court erred in failing to make a specific finding as to the benefit rate, and (4) whether the trial court erred in failing to award plaintiff discretionary costs. Although we hold that the plaintiff's injury arose out of the plaintiff's employment, we affirm the trial court's conclusion that the plaintiff received no permanent disability from his injury.

**Tenn. Code Ann. § 50-6-225(e) (1999) Appeal as of Right; Judgment of the Chancery Court is Affirmed in part, Reversed in part and Dismissed**

ROBERT L. CHILDERS, SP. J., delivered the opinion of the court, in which JANICE M. HOLDER, J., and JOE C. LOSER, Sp. J. joined.

J. Mark Patey, Jackson, Tennessee, for the appellant, Robert LeeGrand.

William F. Kendall, III, B. Duane Willis, Jackson, Tennessee, and J. Michael Morgan, Nashville, Tennessee, for appellee, Trinity Universal Insurance.

## MEMORANDUM OPINION

This workers' compensation appeal has been referred to the Special Workers' Compensation Appeals Panel of the Supreme Court in accordance with Tenn. Code Ann.§ 50-6-335(e)(3) for the hearing and reporting of findings of fact and conclusions of law.

Plaintiff, Robert LeeGrand, filed a Complaint for workers' compensation on January 28, 1999. The trial was heard on August 8, 2000. At the conclusion of the proof, the trial court found plaintiff's injuries resulted from an altercation precipitated by personal reasons and, therefore, did not arise out of the employment relationship. The trial court also found that plaintiff sustained no permanent disability from the injury. As a result the trial court denied plaintiff's claim and dismissed the action. For the reasons discussed below, we reverse in part and affirm in part, and dismiss.

## FACTS

Plaintiff, a forty-one year old African-American man, had been employed with M & S Masonry as a brick mason's assistant since November, 1998. Late in the work day on January 12, 1999 plaintiff was instructed to get another batch of mortar, or mud, for use in laying bricks. Plaintiff was assisting another employee in taking the pans of mortar to the bottom of the bricklayers' scaffold, and the other employee transported the pans to the top of the scaffold. Several employees were working on top of the scaffold. Plaintiff asked one of them, Tommy Truex (Truex), how much mud was left in the pans. Truex looked down at plaintiff and asked why plaintiff had made so much mud, and called plaintiff "a dumb ass nigger". Plaintiff then climbed up on top of the scaffold. While atop the scaffold he approached Truex to ask why he would speak to plaintiff in such a manner. As plaintiff approached Truex, Truex threw two bricks at plaintiff, striking him in the leg and head, which caused plaintiff to fall about twelve feet from the scaffold to the ground, resulting in injuries to plaintiff's back.

Plaintiff had suffered a previous work related injury to his back in August, 1997 while working at International Mill Service (IMS). That injury required surgery in May, 1998 for a ruptured disc at L5-S1. Plaintiff filed a workers' compensation claim for the August, 1997 injury that was settled in September, 1998. Plaintiff was subsequently released to return to work in August, 1998, and attempted to return to work at IMS, but resigned shortly thereafter and began looking for another job. After going on a belated honeymoon in September, 1998 plaintiff began working for M & S Masonry in November, 1998.

Plaintiff was treated by Dr. James G. Warmbrod, Jr. for the injuries he received from the January 12, 1999 incident. Dr. Warmbrod's initial diagnosis was a resolving cervical lumbar strain. Plaintiff underwent a MRI that Dr. Warmbrod opined showed a small recurrent lumbar disk. Dr. Warmbrod agreed with the opinion of Dr. Robert J. Barnett that plaintiff had a five percent (5%) permanent partial impairment to the low back and a four percent (4%) permanent partial impairment to the neck as a result of the fall from the scaffold.

Dr. Robert J. Barnett saw plaintiff to perform an impairment evaluation on October 18, 1999. Dr. Barnett had previously given plaintiff a permanent impairment rating for the back injury he suffered in August, 1997. It was Dr. Barnett's opinion that plaintiff sustained a five percent (5%) permanent partial anatomical impairment to his low back, and a four percent (4%) permanent partial anatomical impairment to his neck, as a result of the fall from the scaffold, for a total of nine percent (9%) permanent partial anatomical impairment to the body as a whole.

Dr. Lowell F. Stonecipher saw plaintiff for an independent medical examination on May 26, 1999. Dr. Stonecipher opined that plaintiff had a possible recurrent disk, but he could not say whether the possible condition was caused by the fall from the scaffold or by the previous disk surgery from the August, 1997 back injury. Regardless of the cause, however, Dr. Stonecipher testified that plaintiff had no additional anatomical impairment from the possible recurrent disk.

Dr. John D. Brophy treated plaintiff for the work-related back injury that plaintiff suffered in August, 1997, and performed the disk surgery on May 29, 1998. Dr. Brophy also saw plaintiff on February 17, 1999 after the fall from the scaffold. Dr. Brophy diagnosed mechanical neck and back pain without evidence of radiculopathy or myelopathy. He stated that although the March, 1999 MRI was suggestive of a possible recurrent herniated disk, he did not think that there was evidence of a recurrent herniated disk, based on his findings from reviewing the MRI test results, his physical examination of plaintiff, and plaintiff's history. Dr. Brophy's opinion was that plaintiff's condition was not advanced by, and that plaintiff had no permanent impairment from, the fall from the scaffold.

## ANALYSIS

The trial court, after hearing testimony and weighing the evidence, found that the focus of the altercation, or fight, was for personal reasons in the use of a racial slur, and that workers' compensation benefits did not apply to this case. The trial court also found that there was no permanent disability as a result of plaintiff's injury.

Appellate review is *de novo* upon the record of the trial court, accompanied by a presumption of correctness of the findings of fact, unless the preponderance of the evidence is otherwise. Tenn. Code Ann. § 50-6-225 (e)(2). This tribunal is not bound by the trial court's findings, but instead conducts an independent examination of the record to determine where the preponderance lies. *Galloway v. Memphis Drum Serv.,* 822 S.W.2d 584, 586 (Tenn. 1991). Considerable deference must be given to the trial court's finding of fact, especially where issues of credibility are involved. *Collins v. Howmet,* 970 S.W.2d 941, 943 (Tenn. 1998). The appellate tribunal, however, is as well situated to gauge the weight, worth and significance of deposition testimony as the trial judge. *Orman v. Sonoma, Inc.,* 803 S.W.2d 672, 676-77 (Tenn. 1991).

An employee's right to recover under the Workers' Compensation Act requires a finding that the injury arose "out of and in the course of employment." Tenn. Code Ann. § 50-6-102(5). The phrases "arising out of" and "in the course of" employment comprise two separate requirements. *Woods v. Harry B. Woods Plumbing Co.,* 967 S.W.2d 768, 771 (Tenn. 1998). The phrase "in the course of" refers to the time, place and circumstances under which the injury occurred. *McAdams v. Canale,* 200 Tenn. 655, 294 S.W.2d 696, 699 (1956). The phrase "arising out of" refers to an injury's origin. *Id.*

The "course of employment" requirement is satisfied when an injury occurs within the time and place limitations of the employment relationship and during an activity that had some connection

with the employee's job-related functions. *Woods, supra* at 771.  There is no dispute that plaintiff was on the job site, during working hours when he was injured.

We next look at whether plaintiff's injuries arose out of his employment.  An accident arises out of employment when there is a causal relationship between the employment and the injury. *Orman v. Williams Sonoma, Inc.* 803 S.W.2d  672, 676 (Tenn. 1991).  Issues of whether assaults upon employees arise out of the scope of employment can be divided into three general classifications: (1) assaults with an "inherent connection" to employment such as disputes over performance, pay or termination; (2) assaults stemming from "inherently private" disputes imported into the employment setting from the claimant's domestic or private life and not exacerbated by the employment; and (3) assaults resulting from a "neutral force" such as random assaults on employees by individuals outside the employment relationship.  *Woods, supra.*

Assaults with an "inherent connection" to employment are compensable.  *See W.S. Dickey Mfg. Co. v. Moore,* 208 Tenn. 576, 347 S.W.2d 493 (1961) (injuries arising out of dispute over job performance compensable).  We have reviewed the trial testimony of the employees who were present when plaintiff was injured to determine whether the assault on plaintiff had an inherent connection to plaintiff's employment.

Tommy Truex gave the following testimony regarding the events leading up to the assault:

> It started at 2:30.  We were out of mud.  All the masons were standing on the scaffold, Robert being the forklift driver.  There was another forklift driver.  I told Robert to go make up another batch of mud.  "We are out of mud".  He said, "The mixer has already been cleaned out".  I said, "Well, I don't care if the mixer has been cleaned out.  We can't stand here for an hour".
>                                          . . .
> So about a quarter till 3:00 or ten minutes till 3:00, we got to wondering, well, where's the mud, where's the mud, so I went across the building. The mixers were on the back side of the building, and I yelled down, "What's - - You know, come on and bring the mud.  We've got to use it up", so Robert come around and he had two batches of mud.  His pans overflowed, so, of course, the bricklayers and I are upset because we ain't going to stay past 3:30.  We're - - Brickmasons (sic) are going to make sure the mud is gone so we can leave that job at 3:30, and we don't care how we do it. We throw the mud in a block, behind a wall, just to get rid of it so we can go home.  Well, that's when the argument started.
>                                          . . .
> [Plaintiff] said, "What you gonna do with all that mud?"  I said . . . I called Robert a stupid nigger. . .  and then an argument ensued.

Truex further testified that "[t]he whole thing was about the job.  The whole argument was

-4-

about the job, about not having enough mud on the scaffolds. The bricklayers were going to be standing there for an hour."

Another employee who also witnessed the events, Charlie Hollis, testified that he heard plaintiff ask Truex, "what are you going to do with the rest of the mortar?" He said Truex replied, "You stupid nigger, why did you make so much?" Another employee, Kevin Dillon, witnessed the events and testified that plaintiff asked Truex, "what are you gonna do with all that mortar?" "Tommy called him a dumb-ass nigger and [plaintiff] told him to come down off the scaffold."

The only other employee to testify, other than plaintiff, was Charlie Miller, a partner in M & S Masonry. Miller offered no testimony about any events before Truex made the racial slur to plaintiff. He testified that what first brought everything to his attention was when plaintiff came to him and said, "I'm not going to have nobody calling me . . . the "n" word".

While the evidence establishes that the racial slur upset plaintiff, it also establishes that the assault by Truex on plaintiff originated in a dispute about the work that plaintiff was doing on the job site. We find that plaintiff's injuries had an "inherent connection" to the employment setting and arose out of employment as contemplated by the Workers' Compensation Act. We find the evidence preponderates against the trial court's judgment on this issue and we reverse.

The next issue for our review is whether plaintiff sustained a permanent disability as a result of his injury. There was a conflict in the testimony of the four physicians who testified. Dr. Barnett testified, and Dr. Warmbrod agreed, that plaintiff suffered a permanent impairment as a result of the fall from the scaffold. Dr. Brophy and Dr. Stonecipher testified that plaintiff did not suffer a permanent impairment from the fall. The trial judge chose to believe the testimony of Dr. Brophy and Dr. Stonecipher over that of the other physicians. If there is conflicting medical testimony, the trial judge is free to conclude that the opinion of a particular expert should be accepted over that of another expert. *Thomas v. Aetna Life & Casualty Co,* 812 S.W.2d 278 (Tenn. 1991). We find that the evidence does not preponderate against the trial court's judgment that plaintiff sustained no permanent disability. We affirm the judgment of the trial court on this issue.

The two remaining issues have been pretermitted in light of our decision affirming the trial court's judgment that the plaintiff sustained no permanent disability. We, therefore, affirm the trial court in part, reverse in part, and dismiss. Costs are taxed to the plaintiff/appellant.

---

        ROBERT L. CHILDERS, SPECIAL JUDGE

# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON

# ROBERT LEEGRAND, Appellant v.
# TRINITY UNIVERSAL INSURANCE, Appellee

**Chancery Court for Madison County**
**No. 55719    Joe C. Morris, Chancellor**

_____

**No.  W2000-02664-SC-WCM-CV - Filed May 22, 2002**

_____

## JUDGMENT

This case is before the Court upon Applicant's motion for review pursuant to Tenn. Code Ann. § 50-6-225(e)(5)(B), the entire record, including the order of referral to the Special Workers' Compensation Appeals Panel, and the Panel's Memorandum Opinion setting forth its findings of fact and conclusions of law, which are incorporated herein by reference;

Whereupon, it appears to the Court that the motion for review is not well-taken and should be DENIED; and

It is, therefore, ordered that the Panel's findings of fact and conclusions of law are adopted and affirmed, and the decision of the Panel is made the judgment of the Court.

Costs will be assessed to Appellant Robert LeeGrand for which execution may issue if necessary.

PER CURIAM

Holder, J., not participating

-6-